**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-CR-0139-CVE** |
| | ) | |
| **TRUONG SON DO,** | ) | |
| **HONG VAN THI NGUYEN,** | ) | |
| **VINH NGUYEN,** | ) | |
| **a/k/a Vinh Thi Nguyen,** | ) | |
| **a/k/a Vinh Hoang Nguyen,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court are Defendant Truong Son Do's Motion to Suppress Evidence with Brief (Dkt. # 43), Defendant Vinh Nguyen's Motion to Suppress Evidence with Brief in Support (Dkt. # 48), and defendant Hong Van Thi Nguyen's Motion to Join in Defendant Do's Motion to Suppress (Dkt. # 49). Defendants Truong Son Do (Do), Hong Van Thi Nguyen (Hong), and Vinh Nguyen (Vinh) are charged with conspiracy to distribute and possess with intent to distribute marijuana (count one) and possession of marijuana with intent to distribute (count two). Do is also charged with receipt of a firearm while under indictment, in violation of 18 U.S.C. § 922(n) (count three). Defendants ask the Court to suppress evidence seized during searches of homes and vehicles that occurred on May 28 and August 28, 2014, and to suppress any statements obtained by police in violation of defendants' Fifth Amendment rights. The Court held an evidentiary hearing on October 6, 2014, and defendants were present at the hearing and were represented by counsel.

# I.

On May 28, 2014 United States Postal Inspector Al Chapa was advised of a suspicious package. The package was being sent to 4405 West Jackson Street in Broken Arrow, Oklahoma, and the package was addressed to "Tony Thai." Chapa testified that an alert had been placed on any packages being sent to this address. Chapa contacted Broken Arrow Police Department (BAPD) Detective Jacob Westerfield and Sergeant John Zoller, and he asked Westerfield and Zoller to go to a Broken Arrow post office to examine the package. Westerfield examined the package, and observed that it was an overnight mail package sent to "Tony Thai" and it was heavily taped. Around 3 p.m. on May 28, 2014, Westerfield, Zoller, and Chapa, all dressed in plain clothes, took the package to 4405 West Jackson Street. They observed an older Vietnamese man doing work in the side yard, and they identified themselves and attempted to talk to him. The side yard was inside a fence that fully enclosed the back of the house. The man did not appear to understand English, and he went inside and spoke to someone in the house. Do exited the house from a side door, and the older man returned to mowing the yard. Do made contact with the law enforcement officers and spoke to them near the gate to the fence. The gate was about 30 feet from the street and it is not clear if the men were visible to persons from the street.

Chapa spoke to Do about the package and Do acknowledged that the package was addressed to 4405 West Jackson Street. Do denied that he was expecting a package or that he had any idea what was in the package, and Chapa asked if he could open the package. Do told Chapa to go ahead and open the package, and Chapa discovered six individually wrapped bags of marijuana inside the package. Each individually wrapped package weighed approximately one pound. Westerfield also

noticed an odor of air freshener or Fabreze inside the package.  Do denied knowing that the package would contain marijuana and he said that it was not his marijuana.

Chapa heard Do's cell phone buzz or ring and he asked if Do had a cell phone, and Do produced a cell phone from his pocket.  Chapa asked if he could see the phone and Do twice asked if he had to give the phone to Chapa.  Chapa explained that Do could refuse the request but that information on the cell phone might clarify if Do was expecting a package.   Westerfield took the phone from Do and he noticed that the phone was locked.  Westerfield held out the phone and Do unlocked it with his thumbprint.  Do asked why the law enforcement officials wanted to look at the phone, and Chapa explained that tracking information or postal numbers might be stored on the phone.  Westerfield scrolled through pictures and text messages on the phone and Westerfield believed that the text messages concerned drug transactions.  In particular, one of the text messages stated that a package was "22g short," and this suggested to Westerfield that a shipment of drugs was missing 22 grams of marijuana.  There were also text messages about United States Post Office packages and a picture of a package addressed to "Tony Thai.  Westerfield also observed many photographs of firearms stored in Do's phone.  Do did not at any time attempt to revoke his consent to search the contents of the phone.

While Westerfield was searching the phone, he simultaneously told Chapa and Zoller about what he observed on the phone, but Do remained silent during their discussion.  Westerfield asked for consent to search Do's residence and Do remained silent.  The law enforcement officals advised Do that they could not simply walk away after learning of the contents of the package and the information on Do's cell phone, and they advised Do that they had three options: they could place Do and his father under arrest; they could get a search warrant; or Do could consent to a search of

the residence.  Do asked Chapa if he had to consent to a search of his home, and Chapa responded

"absolutely not."  Westerfield told Do that he and potentially his father could be arrested, and any

issues of ownership of the marijuana could be resolved by a court.  The older Vietnamese man, Do's

father, approached Do and spoke to Do in Vietnamese.  Westerfield asked Do and his father to speak

in English, but they continued to speak in Vietnamese.  During this part of the encounter, Do started

to tear up and asked if his father could leave, but law enforcement officials would not let Do's father

leave.  Chapa briefly stepped away from Westerfield and Zoller, and he attempted to speak to Do's

father.  Chapa's attempts at communicating with Do's father were unsuccessful.  While Chapa was

attempting to talk to Do's father, Westerfield reminded Do of the options for searching Do's home,

and Do stated that he consented to the search.  Westerfield did not ask for the consent of Do's father

to search the residence.  At this point in the encounter, it appears that the law enforcement officials

believed that Do's father resided in the home.   Do's father sat down in the side yard during the

search of the phone, but he was not ordered to remain there during the search of the house.

Westerfield approached the side door of the home and smelled burnt marijuana.  The side

door was unlocked and Westerfield and Zoller entered the home with their guns drawn.  Police

conducted a safety sweep and then holstered their weapons after completing the sweep.  Do was

permitted to enter the house and he was placed in handcuffs with his hands in front.  After entering

the home, Do told Westerfield that his father did not live in the house and his father came over only

for the purpose of helping with yardwork.  Do stayed in the kitchen during the search, and he was

accompanied by one of the law enforcement officials at all time during the search. Zoller testified

that Zoller spoke to Do when Zoller was not actively searching the house, and they did not discuss

the search or marijuana.  However, the law enforcement officials took turns staying with Do and Do

was not always with the same person.  At some point during the search, Do's father opened the kitchen door and spoke to Do, and Do asked if his father could leave to pick up Do's nieces and nephews from school.  Do's father was permitted to leave.  During the search, Chapa, Westerfield, and Zoller recovered a small amount of marijuana, drug paraphernalia, $6,000 in cash, residency papers, a piece of cardboard with the name "Tony Thai" and Do's address, and 32 firearms.  Zoller testified that  some of the guns were found in a safe, and Chapa clarified that Do opened the safe using a combination.  Chapa testified that the search of the residence took at least 45 minutes and possibly up to one hour.  After the search, Do signed a written consent form for the search of the residence, a <u>Miranda</u> waiver, and a written statement that he dictated to Westerfield.  Do was arrested on state drug charges and he was released on bond.  Do's preliminary hearing in state court has been continued and the state court charges are still pending.

In July 2014, Westerfield came into contact with a confidential informant (CI) with knowledge of Do's drug trafficking activities, and the CI had been participating in the investigation into Do's alleged drug trafficking.  Westerfield formed an opinion that the CI was reliable based, in part, on a controlled buy conducted by the CI.  On August 27, 2014, the CI told Federal Bureau of Investigation Special Agent Matthew McCullough that Vinh had informed the CI about a package that would be arriving at the CI's residence the next day.  Westerfield attempted to locate and intercept the package before it was delivered, but his efforts were unsuccessful.  On August 28, 2014, the CI advised McCullough that the package had arrived at the CI's residence, and that Do had immediately picked up the package.  The CI described Do's vehicle, and law enforcement officers set up surveillance near Do's residence.  Westerfield was stationed near 800 South Cypress Place in Broken Arrow when he observed Do's vehicle driving southbound on Cypress Place, and

he saw Do make a left turn without using a turn signal.  Westerfield initiated a traffic stop of Do's vehicle at 800 South Butternut Avenue.  The traffic stop took place inside a gated community. Westerfield had gained access to the gated community by following Do's vehicle after Do opened the gate.

Westerfield approached Do's vehicle from the driver's side and he asked Do to step out of his vehicle.  As Do stepped out of the vehicle, he started making spontaneous statements to Westerfield about a "guy in California."  Westerfield took Do toward the rear of Do's vehicle, and Do continued to make spontaneous statements.  Westerfield believed that Do might make incriminating statements, and Westerfield gave Do a <u>Miranda</u> warning before allowing Do to make any more statements.  Do stated that he understood his rights, and he began to talk about collecting pictures of the man in California and about his desire to work for Westerfield.  Do also said that he knew he should not have picked up the box that was in his vehicle.  Westerfield had not mentioned the box to Do.  Westerfield asked Do if there was any marijuana in the vehicle, and Do nodded in the affirmative.  Westerfield placed Do in handcuffs for officer safety.  Do voluntarily opened the trunk to his vehicle and showed Westerfield the package, but Westerfield left the package in the trunk.  The return address was the same as the May package, but Westerfield did not know the CI's address and he could not confirm that the package was actually delivered to the CI's address. Westerfield called for a canine unit, and the canine alerted to the presence of drugs in the trunk of the vehicle.  Do refused to sign a consent form for a search of the package or his residence, but he verbally consented to a search of the package.  Westerfield opened the package and it contained five manila envelopes containing a total of two and a half kilograms of marijuana.  Officers searched the rest of the vehicle and found a high capacity 30 round magazine and a collapsible rifle stock.  Zoller

questioned Do about the magazine and rifle stock, and Do admitted that he had purchased an AK-47 rifle after the May 28, 2014 search of his residence.

After Westerfield completed the stop of Do's vehicle and was waiting for the community gate to open, a black Toyota Tundra pulled up behind his vehicle and Westerfield recognized it from prior surveillance as Vinh's vehicle. Westerfield approached the black Toyota Tundra, and he asked Vinh to exit the vehicle. Westerfield directed Vinh to the rear of Vinh's vehicle and he gave Vinh a <u>Miranda</u> warning. Vinh stated that he understood his rights and he responded to questions asked by Westerfield. Westerfield did not advise Vinh that he was free to leave or that he could refuse to decline to have a consensual encounter with Westerfield. The canine unit was still present from the search of Do's vehicle, and the canine was called to perform an open air sniff of Vinh's vehicle. The canine alerted to Vinh's vehicle, and a Suboxone strip was found in the handle of the driver side door. Westerfield asked Vinh if he had marijuana at his residence, and Vinh stated that he had two pounds of Do's marijuana at his residence. Vinh signed a consent form for a search of his residence, and Westerfield and Zoller accompanied Vinh to the residence. Once they entered the residence, Vinh asked Westerfield and Zoller to remove their shoes, and they complied with this request. Vinh directed Westerfield and Zoller to an upstairs office, and he opened a lockbox in an upstairs office. Zoller recovered four packages containing a leafy green substance from the lockbox and he believed that the packages contained marijuana. Vinh also voluntarily showed the officers a digital scale. Vinh also provided the combination for a gun safe, which contained $700 in cash. Ammunition was also found in the residence.

On August 28, 2014, Westerfield prepared an affidavit for a search warrant for Do's residence, and the warrant was issued on the same day by Tulsa County District Judge Cliff Smith.

Plaintiff's Exs. 7 and 8.  Westerfield was not present during the initial entry into Do's residence, but the search warrant was executed on August 28, 2014.  There were at least nine law enforcement officials present to execute the search warrant.  McCullough was present from the inception of the search, and he testified that Hong answered the door when police officers announced their presence. McCullough wanted to learn why Hong was in the residence, and he initiated a conversation with her.  McCullough testified that he believed that Hong was free to leave at any point during the conversation, but he did not expressly tell Hong that she could refuse to talk to him.  Hong stated that she had recently moved to Broken Arrow from California.  She was aware of Do's May 28, 2014 arrest on drug charges, but he had promised Hong that he would stop selling marijuana.  Hong told McCullough that she knew marijuana suppliers in California and she introduced Do to those suppliers.   Westerfield arrived after the search started and talked to McCullough about McCullough's interview of Hong.  They believed that Hong might be withholding information and they asked her many of the same questions again.  Hong's answers did not significantly change but she provided some additional information, and McCullough formed an opinion that Hong was forthcoming about her knowledge of illegal activity.  McCullough did not give Hong a <u>Miranda</u> warning at any point during the encounter, because he did not initially believe that she would be a suspect in any criminal activity.  However, McCullough knew before entering the house that the CI had implicated Do's "girlfriend" as a participant in a possible drug conspiracy.  At some point in the encounter, McCullough also recalled that he had seen Hong's name on financial activity reports and

that she was potentially implicated in illegal financial transactions.[1]  All of Hong's statements were made in response to questions and she did not make any spontaneous statements.

Do testified at the suppression hearing and provided a very different version of the events on May 28 and August 28, 2014.  He testified that he had lived in the United States for about 20 years and that he attended school here.  He claims that his father came over to the West Jackson Street house around 2 or 3 p.m. on May 28, 2014 to help with yard work.  Do denies that his father opened a door to call for him after police entered the side yard, and Do claims that he just happened to walk out of the door and observed his father talking to Westerfield, Zoller, and Chapa.  Do talked to the men and Do testified that Chapa asked questions about who lived in the residence.  Chapa also asked if Do was expecting a package.  Do denied that he was expecting a package and Chapa opened it with a knife, and Do claims that he was "shocked" to see marijuana in the package.  Do testified that Chapa immediately threatened to place Do and his father under arrest, and he told the law enforcement officials that "some guy" used Do's address for the delivery of packages such as the one discovered by Chapa.  Do received a text message and took out his phone to look at the message, and Chapa asked to see the phone to look for a tracking number for the package.  Do states that he consented to allow Chapa to look at the phone for the limited purpose of looking for the tracking number.  Do unlocked the phone for Chapa, but he claims that Westerfield grabbed the phone and began searching pictures and text messages on the cell phone.  Do testified that Westerfield placed Do in handcuffs after searching the cell phone, and Do's father became emotional and started crying.  Do states that Chapa threatened to take Do and his father to federal

---

[1]    Plaintiff and Hong have stipulated that Hong did not receive a <u>Miranda</u> warning and that McCullough was aware during the interview that Hong could have made deposits to bank accounts.

prison and that Do's father would be permitted to leave only if Do consented to a search of the residence.  He also claims that one of the officers took Do's father's car keys.  According to Do, Chapa requested consent to search the house to look for packages similar to the one opened that day in the side yard.  Do admitted to having personal use marijuana in the residence and he stated that he was a gun collector.  Do testified that he consented to a search of his residence only because police threatened to take his father to jail.  Do states that he was already handcuffed behind his back when he opened the side door for the officers, and that he stayed in the kitchen while his home was searched.  Do claims that his handcuffs were removed near the end of the encounter to allow him to sign a <u>Miranda</u> waiver, a consent to search form, and the statement written by Westerfield.  As to the traffic stop on August 28, 2014, Do testified that he turned into the gated community and he "believes" that he used his left turn signal when making the turn.

## II.

Do asks the Court to suppress evidence seized from his home on May 28, 2014, and he also seeks to suppress evidence seized as a result of the searches of his vehicle and home on August 28, 2014.  Dkt. # 43.  Vinh argues that his vehicle was illegally stopped on August 28, 2014, and he asks the Court to suppress evidence found in his vehicle and the subsequent search of his home.  Hong has stipulated that she has standing to challenge only the August 28, 2014 search of the West Jackson Street residence and any statements she made during her encounter with McCullough.

May 28, 2014 Search of the Package

Plaintiff argues that Do does not have standing to contest the search of the package, because he denied that the package was sent to him.  Do responds that law enforcement officials committed a constitutional violation by breaching the curtilage of his home without a warrant or consent, and

all evidence recovered from his home, including the package, should be suppressed.  Dkt. # 59, at 2-3.

The law is well settled that a person gives up any reasonable expectation of privacy in an item by denying ownership or possession of the item.  United States v. Denny, 441 F.3d 1220, 1228 (10th Cir. 2006).  The mere fact that a person disclaims ownership or abandons property at the time of police pursuit or investigation does not render the abandonment involuntary.  United States v. Hernandez, 7 F.3d 944, 947 (10th Cir. 1993).  However, this rule applies only if no Fourth Amendment violation occurred prior to the abandonment and an abandonment cannot be deemed voluntary when it results from an earlier Fourth Amendment violation.  United States v. Garzon, 119 F.3d 1446, 1451 (10th Cir. 1997); United States v. King, 990 F.2d 1552 (10th Cir. 1993).

Do claimed that he was not expecting a package and he did assert any right to the package, but he has challenged whether Chapa, Westerfield, and Zoller lawfully entered his side yard.  The Court construes this as an argument that police had no lawful right to enter the curtilage of Do's home, and this could be a prior constitutional violation giving Do standing to challenge the voluntariness of his abandonment of the package.  See King, 990 F.2d at 1562.  Curtilage is the "land immediately surrounding and associated with the home" and the Fourth Amendment protections applicable to the home also extend to the curtilage surrounding the home.  United States v. Shuck, 713 F.3d 563, 567 (10th Cir. 2013).  The backyard is generally considered to be within the curtilage of a person's residence.  United States v. Carter, 360 F.3d 1235, 1241 (10th Cir. 2004). The Tenth Circuit has provided a four factor test to determine if an area should be treated as curtilage for Fourth Amendment purposes: "(1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the

area is put; and (4) the steps taken by the resident to protect the area from observation." United States v. Cousins, 455 F.3d 1116, 1122 (10th Cir. 2006). Warrantless entry into the curtilage of a home is permitted if there are exigent circumstances or the homeowner has consented to the entry. Id. Police may also approach a residence using the "normal route of access," including through the curtilage, if this is the way any other person would use to visit the residence. Shuck, 568 F.3d at 567-68.

Applying the four factor test, the Court finds that the side yard is curtilage. The area is immediately adjacent to the house and it is included within an enclosed fence. The area is put to private use and there is no evidence that the area is accessible to the public for any reason. The homeowner fully enclosed the side yard with a fence, and this strongly suggests that owner intended to protect the area from observation. The side yard meets each of the four factors under Cousins and it should be treated as curtilage. The parties did not present any testimony or evidence concerning how normal persons would attempt to make contact with residents of 4405 West Jackson Street, but they have provided pictures of the residence. The pictures show a driveway with a connected sidewalk leading to a clearly visible front door. Plaintiff's Ex. 1 and 1A. This appears to be the route that a person would ordinarily use to gain access to the property. However, there were other circumstances present on May 28, 2014 that could have lead police to believe that they could enter the side yard through the gate. When police arrived at the residence, the gate to the side yard was open and they observed an older man mowing the lawn. Westerfield, Zoller, and Chapa have differing recollections as to where the man was when they initially attempted to make contact with him, and Zoller and Chapa recall that they entered the gate to the side yard when attempting to speak to the older man. Chapa attempted to speak to the man and the man stopped mowing the yard, but

he made motions suggesting that he did not understand Chapa's questions.  Chapa testified that he did not form an opinion that the man could not speak English until later in the encounter.  While these factors suggests that a normal person might have entered the side yard to make contact with the older man, there is no evidence that persons would ordinarily attempt to gain access to the house through the side yard or that the older man gave some sign that he consented to the entry into the side yard.

The Court finds that police did enter the curtilage of the home without the consent of the occupant or owner, and the government has not shown that a normal person would attempt to gain access to the property through the gate to the side yard.  The government bears the burden to show that a constitutional violation did not occur and it has made no argument that police had the right to enter the curtilage without the owner's consent.  United States v. Mikolon, 719 F.3d 1184, 1189 (10th Cir. 2013) (in ruling on a motion to suppress the government bears the burden to show that evidence is admissible).  Although there are some facts suggesting that a normal person might have attempted to communicate with Do's father, the government has made no argument that police believed that the normal access to the house was through the side yard.  The Court will treat the entry into the curtilage as a Fourth Amendment violation, and this violation does give Do standing to contest the voluntariness of his abandonment of the package.

Even though Do has standing to challenge his abandonment of the package, the Court finds that he voluntarily abandoned any reasonable expectation of privacy in the package.  The testimony of Westerfield, Zoller, and Chapa was consistent that Chapa asked Do if he was expecting a package and that Do denied that he was expecting a package.  The testimony of each of these witnesses was also consistent that Do gave his consent to open the package.  Do's testimony is also consistent with

the testimony of Westerfield, Zoller, and Chapa on these points, and he testified that he told the officers that it was not his package.  As to other circumstances, the law enforcement officials were dressed in plain clothes and their weapons were not visible.  There is no evidence tending to suggest that Do's abandonment of the package was involuntarily, and the evidence seized from the package should not be suppressed.

May 28, 2014 Search of Cell Phone

Plaintiff argues that Do consented to a search of his cell phone by voluntarily producing and unlocking the phone for Westerfield.  Plaintiff also argues that Do did not attempt to limit or revoke his consent at any point.  Do challenges the version of events offered by Westerfield, Zoller, and Chapa, and he claims that Westerfield took the phone out of his hand without Do's consent.  Do asks the Court to suppress any evidence seized from the phone and as the fruits of the allegedly illegal search of the cell phone.

The Supreme Court has determined that police must obtain a warrant before searching a suspect's cell phone.  Riley v. California, 134 S. Ct. 2473 (2014).  Consent is a recognized exception to the warrant requirement and, even though not mentioned in Riley, it is reasonable to assume that police may search a cell phone based on the owner's voluntary consent.  See United States v. Silva-Arzeta, 602 F.3d 1208, 1214 (10th Cir. 2010); United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998).  The Tenth Circuit has articulated a two-part test to determine if consent is voluntary:

> First, the government must proffer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given."  Furthermore, the government must prove that this consent was given without implied or express duress or coercion.

United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995).  Consent does not need to be verbal and a "defendant's silence and acquiescence may support a finding of voluntary

consent." United States v. Patten, 183 F.3d 1190 (10th Cir. 1999).  A court must review the totality

of the circumstances to determine if consent was voluntary.  United States v. Santurio, 29 F.3d 550,

552 (10th Cir. 1994).  The Tenth Circuit has identified a list of non-exclusive factors that are often

relevant to determine if consent was voluntary:

> the location of the encounter, particularly whether the defendant is "in an open public place where he [is] within the view of persons other than law enforcement officers;" whether the officers "touch or physically restrain" the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically "advised defendant at any time that he had the right to terminate the encounter or refuse consent."

United States v. Zapata, 997 F.2d 751, 756-57 (10th Cir. 1993) (internal citations omitted).

In this case, the Court has found a prior constitutional violation based on the illegal entry into

the curtilage of Do's home, and plaintiff faces a higher burden to show that defendant's consent to

search his cell phone was voluntary.  "To demonstrate that the taint of an illegal seizure has

dissipated, 'the government must prove, from the totality of the circumstances, a sufficient

attenuation or break in the causal connection between the illegal detention and the consent." United

States v. Fox, 600 F.3d 1253, 1259 (10th Cir. 2010).  Based on the totality of the circumstances, the

Court must consider "(1) the temporal proximity of the illegal stop and the consent; (2) any

intervening circumstances; and (3) the purpose and flagrancy of the officer's unlawful conduct."

United States v. Salas, 756 F.3d 1196, 1203 (10th Cir. 2014).  The first Salas factor is temporal

proximity.  The testimony of Westerfield, Zoller, and Chapa shows that very little time passed

between their entry into the side yard and the opening of the package. Chapa testified that the box

was opened five to ten minutes into the encounter, and Westerfield searched Do's cell phone shortly

after the box was opened.  There was a close temporal proximity between the constitutional violation

and the search of the cell phone.  United States v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994) (period of a few minutes was insufficient to remove taint from a prior constitutional violation).  The second Salas factor is whether there were any intervening circumstances to sever the taint of the prior constitutional violation and Do's consent.  There were at least two important intervening circumstances that do tend to sever the impact of the initial constitutional violation.  The first of these circumstances is that Chapa twice informed Do that he did not have to consent to a search of the cell phone.  United States v. Mendoza-Salgado, 964 F.2d 993, 1012 (10th Cir. 1992) (explanation that a person could refuse to consent is an intervening circumstance that attenuates the taint of a constitutional violation).  The second circumstance is the lawful discovery of marijuana inside the package.  Although Westerfield, Zoller, and Chapa illegally entered the side yard, Do voluntarily abandoned any interest he might have had in the package and the discovery of marijuana in the package changed the nature of the encounter.  Based on this discovery, the encounter could reasonably be treated as an investigative detention instead of a consensual encounter.   As to the third Salas factor, there is no evidence suggesting that the constitutional violation was intentional or that police engaged in illegal conduct for the purpose of intimidating or coercing defendant. Instead, they saw a man mowing the yard and they attempted to make contact with the man, and they entered the side yard without any apparent intent to commit a violation of Do's constitutional rights. Considering the three Salas factors, the Court does not find that a prior constitutional violation tainted Do's consent to search his cell phone.

The Court has found that Do's consent to search the cell phone was not tainted by the initial constitutional violation, but the Court will consider whether any other circumstances tend to show that his consent was involuntary.  The encounter occurred in the side yard of Do's home but it not

clear from the testimony that Do and the officers were visible to persons on the street.  Do was not physically restrained in any way before the search of the cell phone and, even according to his own testimony, the earliest he could have been handcuffed was after the search of the cell phone.  The officers were in plain clothes and they were not displaying any weapons.  Chapa testified that he asked Do if he could look at the phone to determine if there was any tracking information concerning the package, and Do twice asked Chapa if he had to consent.  Chapa advised Do both times that he had a right to refuse consent for a search of the cell phone.  Chapa did say that a search of the cell phone could clarify whether the package was expected by Do.  The Court finds that Chapa's testimony on this issue is credible and that Do was advised that he could refuse to consent to a search of the cell phone.  There is no evidence that police were in possession of defendant's identification or other personal property.  Considering the totality of the circumstances, the Court finds that Do's consent to search his cell phone was voluntary.

Do also argues that Westerfield exceeded the scope of Do's consent by generally searching the cell phone for evidence of illegal activity.  Dkt. # 59, at 4.  The scope of a person's consent to search is considered under an objective standard and a court must consider "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  United States v. Kimoana, 383 F.3d 1215, 1223 (10th Cir. 2004).  A consent to search for specific items "includes consent to search those areas or containers that might reasonably contain those items."  Id.  Westerfield conducted the search of the phone and his testimony does not reflect any limitation on his search of the cell phone.  However, based on Chapa's testimony, it is reasonable to conclude that Do consented to a search of his phone for the limited purpose of determining ownership of the package.  Westerfield's testimony shows that he was reviewing pictures and text messages on Do's

17

phone, and it would be reasonable for a person looking for tracking information about a package to look in these places.  Even if Westerfield found other incriminating evidence, the scope of Do's consent reasonably included the areas of the cell phone reviewed by Westerfield and at no time did Do attempt to revoke his consent.  The Court finds that any evidence seized from the search of the cell phone should not be suppressed.

May 28, 2014 Search of Residence

Plaintiff asserts that Do voluntarily consented to a search of his residence and there is no evidence suggesting that Westerfield, Zoller, or Chapa attempted to improperly coerce Do into giving his consent.  Do argues that there is conflicting testimony as to whether police threatened to arrest Do's father if Do did not consent to a search of the residence, and there is evidence showing that police used this threat to coerce Do to consent to a search of his residence.

The Fourth Amendment ordinarily prohibits the warrantless search of a person's home as per se unreasonable.  Georgia v. Randolph, 547 U.S. 103, 106 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Police face a higher burden when entering a person's home, because "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587 (1980).  Police can enter a person's home with consent, even if probable cause does not exist, provided that the consent is "freely and voluntarily" given.  United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006).  The mere fact that police approached defendant's home to initiate the encounter does not create an inference that defendant's consent was obtained through coercion.  United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005).

18

Do argues that his consent to search his home was involuntary because police threatened to arrest his father if he did not consent to the search.  The mere fact that a police officer states that he could place a person under arrest is not sufficient to show that a person's consent was involuntary, but this is a factor that the court should consider as part of the totality of the circumstances.  See United States v. Jones, 523 F.3d 1235, 1241 (10th Cir. 2008).  It is also improper for police to threaten to detain a suspect while they seek a warrant if police have no basis to detain the suspect. Eidson v. Owens, 515 F.3d 1139, 1147 (10th Cir. 2008).  The issue before the Court is not, as Do suggests, whether police threatened to arrest Do and his father, but the Court must take into account whether police had a legitimate basis to detain Do and Do's father when the statements were made. Under the circumstances, the Court finds that police could at least detain Do and his father for a limited period of time to determine who resided in the home and who might have expected delivery of the package.  After the opening of the package and the search of the cell phone, Chapa asked Do numerous questions about who resided in the home and Do provided evasive answers to Chapa's questions.  Do confirmed in his own testimony that he was being evasive, because his father owned the home and he was concerned that his father's ownership of the home could implicate Do's father in criminal activity.  Chapa testified that it was important to him to establish who lived in the residence and, due to defendant's evasive answers, there was a reasonable basis to believe that Do and his father resided at the home.  Chapa was aware of the contents of the package and evidence recovered from Do's cell phone, and this provided at least reasonable suspicion, if not probable cause, to believe that Do was engaged in illegal activity.  It is less clear that there was much evidence implicating Do's father in any criminal activity, but Do's refusal to clearly identify who resided in the home could have reasonably aroused suspicion that Do's father lived in the home and

knew of the marijuana shipment.  The Court does not find that threats to obtain a search warrant or to arrest Do or his father were unfairly coercive under the circumstances, because police had sufficient information to form a credible opinion that Do and his father could be engaged in marijuana trafficking.  However, the Court will consider the statements as part of the totality of the circumstances as to the voluntariness of Do's consent.

Do's arguments as to consent are largely based on his own testimony.  The Court has heard and observed Do's testimony concerning the events on May 28, 2014 and finds that his testimony is not credible in many important respects.  Do's testimony is somewhat consistent with the other testimony offered at the suppression hearing up to the point that the package was opened.  While there are some differences with the officer's testimony, Do's testimony does establish that he lied to police about whether he expected a package and his capacity for truthfulness becomes an issue even if the Court were to find his testimony wholly credible.  Do admits that he consented to Chapa's request to look for tracking information about the package but he denies that he authorized police to review pictures and text messages.  Even assuming there is a factual dispute as to Westerfield's manner in taking the phone, it is unclear how Westerfield could have looked for tracking information on the cell phone without looking at text messages and pictures.  Do claims that he was immediately handcuffed behind his back and that Chapa threatened to take Do to federal prison after the package was opened.  Aside from the fact that Do's testimony is wholly inconsistent with Westerfield's, Zoller's, and Chapa's testimony on this point, there is no reason to believe that they would put Do in handcuffs behind his back if they wanted Do to open the door and assist with a possible search.  In particular, Do does not explain how could have entered the combination for his gun safe with his hands behind his back.  Do also claims that police refused to let Do's father

leave unless Do consented to a search of his home.  The Court finds no other evidence tending to corroborate Do's testimony that his consent was conditioned upon the release of his father and, in any event, the Court has already determined that police had at least a reasonable suspicion that Do's father resided at the home and that he was involved in criminal activity.

The Court will consider the totality of the circumstances to determine if Do voluntarily consented to a search of his home.  Chapa testified that he asked if he could search Do's home and that Do asked if he had to consent.  Chapa told him "absolutely not" and Chapa testified that he was already contemplating getting a search warrant if Do did not consent.  Do was clearly advised that he could refuse to consent to the search.  It is not clear if the encounter was visible to persons passing by on the street, but the law enforcement officials were wearing plain clothes and they did not display their weapons.  The Court also finds credible the testimony of Chapa, Westerfield, and Zoller that Do was not in handcuffs before the entry into Do's home.  Do was also permitted to speak to his father in Vietnamese, and this suggests that Do was permitted to consult with his father about whether he should consent to the search.  The Court will take into account that Chapa and Westerfield advised Do that Do and his father could be arrested and that they could get a search warrant for Do's home.  However, these were not empty threats and they had substantial evidence that Do and possibly his father were engaged in criminal activity.  There is no evidence that law enforcement officials retained Do's personal effects or identification before he gave his consent. Under the totality of the circumstances, the Court finds that Do voluntarily consented to a search of his home, and the evidence seized during the May 28, 2014 search of Do's home should not be suppressed.

Statements by Do on May 28, 2014

Do argues that any statement he made to law enforcement officials on May 28, 2014 should be suppressed because the entire encounter was tainted by a constitutional violation and he was not given a Miranda warning until the end of the encounter.  Dkt. # 59.  Plaintiff responds that Do was not in custody at any point during the encounter and his statements were made voluntarily, and plaintiff asks the Court to deny Do's request to exclude statements.  Dkt. # 53.

In Miranda v. United States, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Id. at 444.  Under this rule, a court must suppress a statement, even if voluntary, if a proper warning was not given before police initiated custodial interrogation of a suspect.  United States v. Patane, 542 U.S. 630 (2004); United States v. McCurdy, 40 F.3d 1111, 1117 (10th Cir. 1994).  Once a Miranda warning has been given, police must refrain from interrogating a suspect if he unambiguously invokes his right to silence.  Michigan v. Mosley, 423 U.S. 96, 101 (1975).  However, a suspect impliedly waives his right to remain silent if he receives a Miranda warning, understands the Miranda warning, and makes an uncoerced statement to police.  Berghuis v. Thomkins, 560 U.S. 370, 384-85 (2010).  The fruit of the poisonous tree rule does not apply even if defendant successfully proves that police obtained a statement through custodial interrogation without giving a Miranda warning.  United States v. Pettigrew, 468 F.3d 626, 636 (10th Cir. 2006).  The Miranda exclusionary rule requires only that the court exclude any "unwarned statement" itself.  Oregon v. Elstad, 470 U.S. 298, 307 (1985).  Even if police obtain a statement from a suspect in violation of Miranda, this does not taint a subsequent warned confession

or statement if the statement was voluntarily made.  <u>Elstad</u>, 470 U.S. at 309; <u>Pettigrew</u>, 468 F.3d at 635.

At some point before Do signed a <u>Miranda</u> waiver, there is no doubt that he was in custody for <u>Miranda</u> purposes and some of Do's statements should be suppressed.  For the purpose of <u>Miranda</u>, a person is in custody if he is placed under arrest or his "freedom of action is curtailed to a degree associated with formal arrest."  <u>United States v. Benard</u>, 680 F.3d 1206, 1211 (10th Cir. 2012).  This is an objective inquiry and the Court must consider whether a reasonable person would have "understood his situation . . . as the functional equivalent of formal arrest."  <u>United States v. Hudson</u>, 210 F.3d 1184 (10th Cir. 2000) (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984)).  Do was not in custody at the inception of the encounter, even though a Fourth Amendment violation occurred, because a reasonable person would have felt free to tell police to leave his side yard when the encounter was initiated.  However, circumstances changed upon the discovery of marijuana in the package, and Do clearly understood that he could be immediately arrested upon the discovery of the marijuana.  Although he was not immediately placed under arrest, a reasonable person observing the marijuana and threatened with possible arrest would find that the circumstances were the functional equivalent of an arrest.  Do could not have told the police to leave at that point in the encounter and he was being interrogated, and he should have been given a <u>Miranda</u> warning upon the discovery of marijuana in the package.  He did not receive a <u>Miranda</u> warning from Westerfield until police were finished searching his home.  Do's motion to suppress statements should be granted as to any statements Do made after police opened the package and discovered marijuana, because he was in custody for Fifth Amendment purposes and he was interrogated without receiving a <u>Miranda</u> warning.

August 28, 2014 Traffic Stop of Do

Do argues that the August 28, 2014 traffic stop of his vehicle was invalid from its inception, because Westerfield did not observe Do commit a traffic violation.  Dkt. # 59, at 5.  Plaintiff responds that Westerfield observed Do make a left turn without using his turn signal, and Westerfield had reasonable suspicion to believe that Do had committed a traffic violation.  Dkt. # 53.

A traffic stop is treated as an investigative detention, and such a stop is governed by the standards set forth in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005).  In determining the reasonableness of a traffic stop, a court must make two separate inquiries.  The first is whether the police officer had a valid reason for initiating the traffic stop.  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  Id.  Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop.  United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007).  A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning."  United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

The Court must also consider whether the length of the traffic stop was reasonable under the second prong of Terry.  An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation.  See United States v. Zubia-Melendez, 263

F.3d 1155, 1161 (10th Cir. 2001).  An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle," in addition to obtaining the relevant documentation, without exceeding the scope of an investigative detention.  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006).  Such questioning does not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop.  United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).  Police must have reasonable suspicion that criminal activity is afoot to continue a traffic stop beyond the purpose of issuing a warning or citation for the traffic violation.  United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995).  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity."  Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion.  United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted).  Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence."  Alcaraz-Arellano, 441 F.3d at1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).  In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances.  United States v. Arivizu, 534 U.S. 266, 274 (2002).

The sole issue in dispute as to the validity of the traffic stop is whether Westerfield actually observed Do commit a traffic violation.  Do relies on his own testimony in which he stated that he "believed" that he used his turn signal before making a left turn as he entered the gated community. On the other hand, Westerfield had a clear recollection of where he was conducting surveillance,

when he saw Do's vehicle pass his location and Do's failure to signal a left turn.  The Court finds that Do's testimony does not show a clear recollection of the events of August 28, 2014, and his belief that he used his turn signal is not credible.  The Court does find that Westerfield's testimony as to his observation of a traffic violation is credible, and the Court finds that Westerfield had reasonable suspicion to believe that defendant committed a traffic violation.  Thus, the traffic stop was valid at its inception.

Based on the testimony of Westerfield and Zoller, Westerfield had reasonable suspicion that Do was involved in criminal activity and he could continue the traffic stop beyond the purpose of writing a traffic citation.  Westerfield testified that he asked Do to get out of his vehicle, and Do voluntarily began making statements.  Westerfield gave Do a <u>Miranda</u> warning and Do waived his <u>Miranda</u> rights.  Do stated that he had marijuana in his vehicle and he voluntarily opened the trunk to show the package to Westerfield.  Westerfield observed the package and called for a canine unit. He questioned Do in his patrol car while waiting for the canine unit.  The canine unit arrived and there is no evidence suggesting that it was a lengthy wait.  The canine alerted to the box and Westerfield asked for Do's consent to open it, but Do refused to consent to opening the box.  Do also refused Westerfield's request for consent to search Do's home, because Do said that his girlfriend was home.  Westerfield concluded the traffic stop and Do was placed under arrest.  There is no indication that Westerfield continued the stop after Do stated that he would not consent to a search of the box or his home and, instead, Westerfield obtained a warrant for the search of Do's home. Based on these facts, the Court finds that the length of the traffic stop was reasonable, and Do's request to suppress evidence seized from his vehicle should be denied.

Voluntariness of Statements by Do

Do argues that any statements he made to law enforcement officials on August 28, 2014 were involuntary. Plaintiff responds that any pre-<u>Miranda</u> warning statements were made spontaneously by Do and are admissible even though Do had not yet received a <u>Miranda</u> warning. Plaintiff also argues that Do voluntarily waived his <u>Miranda</u> rights as to any subsequent statements.

Do argues that any statements made after the <u>Miranda</u> warning are inadmissible, because his waiver of his <u>Miranda</u> rights was involuntary.[2] The government bears the burden to prove by a preponderance of the evidence that Do voluntarily waived his <u>Miranda</u> rights. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986). The Court must consider the totality of the circumstances to determine whether Do's <u>Miranda</u> waiver was voluntary. <u>United States v. Jones</u>, 701 F.3d 1300, 1318 (10th Cir. 2012). The Tenth Circuit has identified five factors that should be considered to determine whether a <u>Miranda</u> waiver was voluntary:

> (1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment.

<u>United States v. Carrizales-Toledo</u>, 454 F.3d 1142, 1153 (10th Cir. 2006) (quoting <u>United States v. Glover</u>, 104 F.3d 1570, 1579 (10th Cir. 1997)). These factors are not exclusive and a court should consider any other evidence showing that "the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." <u>Id.</u> (quoting <u>United States v. Rith</u>, 164 F.3d 1323, 1333 (10th Cir. 1999)).

---

[2]     Do seems to be arguing that his <u>Miranda</u> waiver was involuntary or tainted due to the illegality of the traffic stop from its inception. The Court has already determined that Westerfield observed a traffic violation and that the scope of the stop was reasonable, and Do's consent was not tainted by a prior constitutional violation.

Westerfield testified that Do spontaneously made statements about a "guy in California" immediately as Do began to exit his vehicle, and Westerfield asked Do to walk toward the rear of Do's vehicle.  Do said that he was nervous and that he should not have picked up a box, but Westerfield had not mentioned a box.  Westerfield gave Do a Miranda warning, and Do stated that he understood his rights and he wanted to speak to Westerfield.  Do claimed that he was collecting pictures of a guy in California and he had wanted to talk to Westerfield about this before the traffic stop.  At this point in the encounter, Do was not making statements in response to questioning by Westerfield.  Westerfield tried to focus Do on the issue of any marijuana that might be found in Do's vehicle, and he asked Do if there were any marijuana in the vehicle.  Do nodded and Westerfield placed Do in handcuffs.  Westerfield again asked if Do had marijuana in the vehicle, and Do said "yes."   Do then opened the trunk of his vehicle and Westerfield observed a box in the trunk. Westerfield called for a canine unit, and Westerfield and Do waited in Westerfield's patrol car while waiting for the canine unit.  Westerfield asked for Do's consent to open the box, and Do refused to sign a consent form.  Westerfield asked Do if he had any marijuana at home, and Do denied that he had any marijuana at his home.  Westerfield sought Do's consent to search Do's home, but Do refused to consent to the search.

The Court finds that Do's initial statements to Westerfield were made spontaneously and any subsequent statements were made following a voluntary waiver of Do's Miranda rights. Do's statements upon exiting the vehicle about the "guy in California" were made voluntarily and not in response to questioning, and  spontaneous statements not made in response to interrogation are admissible even without a Miranda warning.  Pettigrew, 468 F.3d at 633-34.  Do made additional statements after receiving a Miranda warning, but Do stated that he understood his rights and that

28

he wanted to speak to Westerfield.  There is no evidence that it was a particularly lengthy encounter, and Do showed a willingness to talk throughout the encounter.  The Court also takes into account that Do felt confident enough to decline to consent to searches of the box and his home, and this shows that he understood that he could decline requests made by Westerfield.  The Court finds that Do's waiver of his <u>Miranda</u> rights was voluntary and there is no basis to suppress any statements made by Do during the August 28, 2014 traffic stop.

Traffic Stop of Vinh on August 28, 2014

Plaintiff argues that Vinh voluntarily consented to speak to Westerfield and that Vinh should have understood that he was free to leave at any time.  Vinh responds that he was "seized and arrested immediately upon [Westerfield's] exiting his vehicle and taking [Vinh] out of his vehicle."  Dkt. # 58, at 2.  He further argues that Westerfield's vehicle was blocking the exit to the gated community, and Vinh could not have driven past Westerfield and declined the encounter as suggested by plaintiff.

Westerfield testified that he observed a black Toyota Tundra pull up behind his vehicle as he was leaving the gated community after completing a traffic stop of Do's vehicle, and he recognized the vehicle from prior surveillance as Vinh's vehicle.  Westerfield walked toward the black Toyota Tundra and asked Vinh to exit the vehicle.  He immediately gave Vinh a <u>Miranda</u> warning.  The canine unit was still present from the traffic stop of Do's vehicle, and the canine performed an open air sniff of Vinh's vehicle.  The canine alerted to the vehicle, and Westerfield searched the vehicle.  He found a Suboxone strip in the driver's door handle, and Suboxone is a Scheduled II controlled substance.  Westerfield told Vinh that he was aware of Vinh's involvement with Do's marijuana trafficking, and he asked Vinh if Vinh had any marijuana at his residence.

Vinh said that he had two pounds of "Do's weed" at his house.  Westerfield asked Vinh to consent to a search of his home, and Vinh signed a consent form.  Westerfield and Vinh drove to Vinh's home in Westerfield's vehicle, and Vinh's truck was left at the scene of the traffic stop.

The Court finds that no reasonable person would have viewed Westerfield's command to exit the vehicle as a request for a consensual encounter under the circumstances.  Westerfield's vehicle was either partially or wholly blocking the exit to the gated community when he approached Vinh's vehicle.  Westerfield's testimony was unequivocal that he told, not asked, Vinh to get out of his vehicle, and he proceeded to immediately give Vinh a <u>Miranda</u> warning.  This would have alerted Vinh that he was suspected of criminal activity, because Westerfield apparently believed that Vinh might be asked questions that would require incriminating responses.  On cross-examination, Westerfield clearly testified that Vinh was never asked if he consented to the encounter.  Westerfield testified that he knew of Vinh and that he recognized Vinh's vehicle from prior investigation, but there is nothing that would suggest that he believed that he had reasonable suspicion to initiate a <u>Terry</u> stop.  Considering the totality of the circumstances, the Court finds that no reasonable person would have believed that he was free to ignore Westerfield's order to get out of the vehicle and decline the encounter.  Instead, Westerfield initiated an encounter that was much closer in nature to a <u>Terry</u> stop or even an arrest, and there is no evidence that Vinh expressly or impliedly consented to such an encounter.  While a police officer may order a person to exit a vehicle as part of a traffic stop, the officer must actually have reasonable suspicion to initiate a traffic stop and Westerfield's testimony provides no basis for the Court to find that he had reasonable suspicion to believe that Vinh had committed a traffic violation or was otherwise engaged in criminal activity.  Westerfield's encounter with Vinh cannot be considered a traffic stop because it was not supported by reasonable

suspicion.  The encounter also cannot be considered a consent encounter, because no reasonable person in Vinh's position would have believed that he could decline the encounter with Westerfield. Westerfield essentially performed a traffic stop or arrest of Vinh without reasonable suspicion or probable cause, and the evidence seized from Vinh's vehicle on August 28, 2014 should be suppressed.

<u>Search of Vinh's Residence on August 28, 2014</u>

Plaintiff argues that Vinh voluntarily consented to a search of his home and that the evidence seized from Vinh's home is admissible.  Vinh argues that his consent was tainted by the improper traffic stop of his vehicle, and he asks the Court to suppress all evidence seized from his home.

Because the Court has found a constitutional violation, the Court will apply the <u>Salas</u> factors to determine if plaintiff can meet its burden to show that there was a break in the causal connection between the constitutional violation and Vinh's consent to the search of his home.  The first <u>Salas</u> factor is the temporal proximity between the violation and Vinh's consent, and the Court finds that there was a close temporal proximity between these events.  Although the precise amount of time is not in the record, the evidence shows that the canine unit was on hand after the traffic stop of Do and the open air sniff of Vinh's vehicle occurred shortly after the encounter was initiated. Westerfield asked for Vinh's consent after the dog sniff and search of Vinh's vehicle, and there was little or no break between the initial constitutional violation and Vinh's consent.  The second <u>Salas</u> factor is whether there were any intervening circumstances to break the causal connection between the constitutional violation and Vinh's consent.  The mere fact that Vinh consented is not an intervening circumstance that purges that taint of the prior constitutional violation, and the government must show that the consent was voluntary and sufficiently attenuated from the

constitutional violation.  United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994).

Although Vinh did consent to a search of his home, the Court has already determined that Vinh did

not consent to the encounter with Westerfield, and his consent to the search of his home was made

after an illegal traffic stop and search.  The Court does not find that Vinh's consent is an intervening

circumstance that breaks the causal connection.  The Court finds no other intervening circumstances

that could tend to attenuate the prior constitutional violation.[3]  As to the third Salas factor, the Court

finds that the constitutional violation was committed purposefully, even if not with the express

intention of violating Vinh's constitutional rights.  Westerfield was reacting to a sequence of events

and there is no evidence that he intentionally disregarded Vinh's constitutional rights, but he should

have appreciated that a reasonable person would not have believed that Westerfield intended to

initiate a consensual encounter.  The Court finds that Vinh's consent to search his home was tainted

by a prior constitutional violation, and his consent was invalid.  Thus, any evidence seized during

the search of Vinh's home should be suppressed.

Statements Made by Vinh on August 28, 2014

Vinh argues that any statements he made during the encounter on August 28, 2014 should

be suppressed, because his waiver of his Miranda rights was tainted by a prior Fourth Amendment

violation.  Plaintiff argues that Westerfield initiated a consensual encounter with Vinh, and plaintiff

could be arguing that Vinh was not in custody for Fifth Amendment purposes.

As explained in relation to Do's statements on May 28, 2014, a person is in custody if he

is placed under arrest or his "freedom of action is curtailed to a degree associated with formal

---

[3]     Although Westerfield discovered an illegal drug in Vinh's vehicle, this is not an intervening
circumstance such as the discovery of marijuana in the package delivered to Do's home,
because the Suboxone strip in Vinh's vehicle was found as a result of an illegal search.

arrest." Benard, 680 F.3d at 1211.  Viewing the circumstances from an objective perspective, a reasonable person in Vinh's position would have believed that his freedom of movement was so limited that it was the functional equivalent of an arrest.  Westerfield's vehicle was blocking Vinh from leaving the gated community, and Westerfield approached Vinh's vehicle.  Westerfield ordered Vinh to get out of his vehicle, and then Westerfield immediately gave Vinh a Miranda warning. Vinh was in custody for the purpose of the Fifth Amendment, and there is no dispute that he subject to interrogation by Westerfield.

Vinh was given a Miranda warning and he responded to questions asked by Westerfield, and this could be treated as an implied waiver of his Miranda rights.  However, in Brown v. Illinois, 422 U.S. 590 (1975), the Supreme Court explained that a Miranda warning does not purge the taint of a prior Fourth Amendment violation, and statements made after a Fourth Amendment violation are admissible only if the causal connection between the constitutional violation and the statements has been broken.  Id. at 601-02.  For the same reasons that Vinh's consent to search was tainted, the Court finds that the implied waiver of his Miranda rights was also tainted.  The mere act of giving Vinh a Miranda warning does not by itself remove the taint of the constitutional violation caused by Westerfield's illegal detention of Vinh, and there were no intervening circumstances tending to break the causal connection between the constitutional violation and Vinh's subsequent statements to Westerfield.  Any statements made by Vinh to Westerfield were tainted by the initial constitutional violation of the invalid traffic stop, and any such statements should be suppressed.

Search of Do's Residence on August 28, 2014

Do appears to be arguing that the search of his home was tainted by one or more prior constitutional violations, and that any evidence seized from the search of his home on August 28,

2014 should be suppressed.  Dkt. # 59, at 5.  Hong joins in Do's request.  Dkt. # 60, at 2.  The only prior constitutional violation that the Court has found was the initial entry into Do's side yard on May 28, 2014, and the Court has found that no constitutional violations occurred on August 28, 2014 as to Do.  The May 28 constitutional violation is so attenuated from the events of August 28 that it could not possibly be viewed as tainting the traffic stop of Do.  Plaintiff has provided a copy of the search warrant and the affidavit prepared by Westerfield, and the Court has reviewed those documents.  Plaintiff's Exs. 7 and 8.  Do does not argue that the warrant was not supported by probable cause.  In any event, the Court has reviewed Westerfield's affidavit and it clearly provides probable cause to believe that marijuana and the fruits and instrumentalities of illegal drug trafficking would be found in Do's home.  Do's and Hong's request to suppress evidence seized from Do's home on August 28, 2014 is denied.

Statements Made by Hong on August 28, 2014

Hong argues that she was subject to custodial interrogation and it is undisputed and stipulated  that she was not given a <u>Miranda</u> warning.  She asks the Court to suppress all statements that she made to McCullough and Westerfield during the execution the search warrant at Do's home on August 28.  Plaintiff cites <u>United States v. Rith</u>, 164 F.3d 1323 (10th Cir. 1999), and argues  that Hong should have understood that she was free to leave at any point during the encounter.

On August 28, police knocked on the door of Do's home to announce their presence and Hong answered the door.  At least nine police officers were present to execute the search warrant. McCullough was present from the beginning of the search, and he immediately wanted to know why Hong was in the residence.  He had previously received information from the CI that Do's girlfriend might be involved in Do's drug trafficking activities.  McCullough began to question Hong, and he

did not give her a Miranda warning or advise Hong that she did not have to answer McCullough's questions.  Hong stated that she was engaged to Do and that she was pregnant.  She had recently moved to Broken Arrow from California, and she was aware of Do's prior arrest.  However, Do had promised Hong that he would stop selling marijuana.  Hong stated that she knew marijuana suppliers in California and that she introduced Do to the suppliers.  Hong admitted that she deposited the proceeds of marijuana sales into a bank account. Westerfield arrived after the search of Do's home had already begun, and he participated in the questioning of Hong.  All of Hong's statements were made in response to questions by McCullough or Westerfield.  McCullough testified that he did not initially give Hong a Miranda warning because he did not believe that she would be a suspect.  However, at some point during the encounter he realized that he had seen Hong's name on financial activity reports and he realized that she could be involved in illegal activity.  McCullough testified that Hong could have left at any time, but there is no evidence that Hong was actually advised that she was free to leave.

The Court finds that Hong should have been advised of her Miranda rights at the beginning of the encounter if McCullough intended to question her about potentially incriminating matters, and any statements by Hong after McCullough established her identity should be suppressed.  Although the execution of a search warrant is not a formal arrest of the occupants of the home, it can quickly become a "police dominated atmosphere," and a reasonable person may believe that she is under arrest, even if this is not the subjective intention of the police officers.  United States v. Revels, 510 F.3d 1269, 1275 (10th Cir. 2007).  In this case, there were at least nine police officers in Do's home and there is no evidence that Hong was told that she could leave.  McCullough began to question Hong about her identity and her relationship to Do, and the conversation quickly strayed into matters

that were potentially incriminating to Hong.  This is a factor suggesting that Hong was in custody. Id. at 1276.  Plaintiff cites Rith for the proposition that a reasonable person present during the execution of a search warrant would not believe that their freedom of movement has been substantially limited during the execution of a search warrant. Dkt. # 62, at 5. However, in Rith, the district court actually suppressed unwarned statements made by a suspect after he was confronted with evidence of a crime but before he was given a Miranda warning. Rith, 164 F.3d at 1332.  The Tenth Circuit affirmed the district court's ruling that the suspect was not in custody until he was presented with incriminating evidence discovered in his home.  This case is distinguishable from Rith.  There were a substantial number of police officers present and Hong was not told that she could leave while the search was performed.  McCullough decided to question Hong without giving her a Miranda warning, even though he knew from the CI that Do's girlfriend was implicated in illegal activity. He did initially attempt to limit his questions as to the subject of Hong's identity and residency, but the conversation quickly shifted into matters that did implicate Hong in criminal activity.  It was not improper for McCullough to ask questions to verify Hong's identity, but a reasonable person would have believed that she was in custody based on the number of police officers present, the nature of McCullough's questioning, and McCullough's failure to give Hong any type of advice that she could leave or refrain from answering his questions.  There is no dispute that Hong was subject to interrogation and that she was not given a Miranda warning at any point during the encounter.  The Court finds that any statement made after Hong verified her identity should be suppressed, because McCullough had prior knowledge that she could be implicated in criminal activity and he continued to question her under circumstances in which a reasonable person would have believed she was in custody.

36

**IT IS THEREFORE ORDERED** that Defendant Truong Son Do's Motion to Suppress Evidence with Brief (Dkt. # 43) is **granted in part** and **denied in part**: it is granted as to certain statements made by Do on May 28, 2014, but it is denied in all other respects.

**IT IS FURTHER ORDERED** that Defendant Vinh Nguyen's Motion to Suppress Evidence with Brief in Support (Dkt. # 48) is **granted**.

**IT IS FURTHER ORDERED** that defendant Hong Van Thi Nguyen's Motion to Join in Defendant Do's Motion to Suppress (Dkt. # 49) is **granted in part** and **denied in part**: Hong's request to suppress statements made during the August 28, 2014 search is granted, but her request to suppress evidence seized during the search is denied.

**DATED** this 17th day of October, 2014.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE